**UNITED STATES of America,**
**Appellant,**

v.

**AERO SPACELINES, INC., a corporation,**
**Appellee.**

**No. 20274.**

United States Court of Appeals
Ninth Circuit.

May 12, 1966.

Phillip C. Jones, Jones & Bednar, Los Angeles, Cal., for appellee.

Manuel L. Real, U. S. Atty., Frederick M. Brosio, Jr., Asst. U. S. Atty., Chief, Civ. Div., Carolyn M. Reynolds, Asst. U. S. Atty., Los Angeles, Cal., for appellant, United States.

Before CHAMBERS, JERTBERG and ELY, Circuit Judges.

JERTBERG, Circuit Judge:

This action was instituted by appellant in the District Court to recover from appellee civil penalties in the aggregate amount of $3,000.00, under the provisions of 49 U.S.C.A. § 1471(a) of the Federal Aviation Act of 1958, as amended, [49

U.S.C.A. §§ 1301 et seq.],[1] for three flights of appellee's aircraft, Boeing B-377 PG which were asserted to have been made in violation of Civil Air Regulation 45.2 [14 C.F.R. 45.2], promulgated by the Federal Aviation Administrator, which reads in pertinent part:

"No person subject to the provisions of this part [covering Commercial Operator Certification and Operation Rules] shall engage in air commerce using aircraft of more than 12,500 pounds maximum certificated take-off weight until he has obtained from the Administrator a commercial operator certificate; * * *"

The amount of the penalty for each flight constitutes the maximum penalty which may be imposed under 49 U.S.C.A. § 1471(a).

The District Court has jurisdiction pursuant to § 1007(b) of the Federal Aviation Act of 1958, as amended, [49 U.S.C.A. § 1487(b)],[2] and by 28 U.S.C. § 1345. This Court has jurisdiction under 28 U.S.C. § 1291.

Both parties filed motions for summary judgment in the District Court and submitted the cause for decision on a written stipulation of facts.

The District Court entered judgment for appellee decreeing "that at the time mentioned in the complaint defendant's aircraft B-377 PG was a 'public aircraft' as that term is used in Section 101(30) of the Federal Aviation Act of 1958, as amended, 49 U.S.C. Section 1301(30),

and, accordingly, at such times the Federal Aviation Act was not applicable to said aircraft and defendant was not subject to the jurisdiction or control of the Federal Aviation Administrator."

The stipulation of facts on which the cause was submitted to the District Court for decision may be summarized as follows:

As the space program moved forward the National Aeronautics and Space Administration, herein NASA, had need for a large capacity aircraft in which could be transported missile sections, components, spacecraft modules and outsized cargo related to the national Space program.

Defendant [appellee] voluntarily undertook to redesign and modify a Boeing B-377 Stratocruiser to meet the needs of NASA and other governmental or private organizations in transporting such missiles, modules, components or other large sized cargo. The resulting aircraft Boeing B-377 PG is the subject of this proceeding.

Until appellee developed the aircraft, there did not exist any aircraft capable of handling and transporting the modules, outsized cargo, missiles and components required in the Government's space program (S-IV Saturn and Apollo).

On January 24, 1962, appellee [through its predecessor] applied to the Federal Aviation Agency [herein FAA], for a Certificate of Airworthiness covering the

---

1. Title 49 U.S.C.A. § 1471(a) (1) provides, in pertinent part, that:
   "Any person who violates * * * any provision of subchapter * * * VI [Safety Regulations of Civil Aeronautics] * * * of this chapter [Chapter 20, Federal Aviation Program] or any rule, regulation, or order issued thereunder * * * shall be subject to a civil penalty of not to exceed $1,-000 for each such violation."

2. 49 U.S.C.A. § 1487 reads in pertinent part:
   "§ 1487. Judicial enforcement; jurisdiction, application; costs
   "(a) * * *

"(b) Upon the request of the Board or Administrator, any district attorney of the United States to whom the Board or Administrator may apply is authorized to institute in the proper court and to prosecute under the direction of the Attorney General all necessary proceedings for the enforcement of the provisions of this chapter or any rule, regulation, * * *, and for the punishment of all violations thereof, and the costs and expenses of such prosecutions shall be paid out of the appropriations for the expenses of the courts of the United States. * * *"

aircraft B–377 PG under 49 U.S.C.A. § 1423.[3]

On February 20, 1963, appellee applied to the FAA for a Commercial Operator's Certificate. See Civil Air Regulation 45.2, supra.

On March 12, 1963, appellee applied to FAA for an exemption from Parts 1 and 8 of Civil Air Regulations re: Airworthiness Certificate. 49 U.S.C.A. § 1421(c) authorizes the Administrator of FAA to grant exemptions from the requirements of any rule or regulation prescribed, if he finds such action to be in the public interest.

On May 2, 1963, the application for such exemption was granted by FAA.[4]

On May 16, 1963, the aircraft B–377 PG was flown for the first time by the appellee in its modified form, and on May 28, 1963, appellee entered into initial contract with NASA, for the period ending July 31, 1963, subject to extension by NASA, but not beyond August 31, 1963. This contract covers a portion of the period during which tests of the aircraft were undertaken to determine if it was airworthy. Also, tests required by NASA were pursued to determine the feasibility of using the aircraft to handle and transport spacecraft modules, space missiles, components, dummies of modules and components, and related cargo. Relevant provisions of the contract appear in footnote [5] of this opinion.

3. 49 U.S.C.A. § 1423:
   " * * *
   * * * * *
   *Airworthiness certificates*
   "(c) The registered owner of any aircraft may file with the Administrator an application for an airworthiness certificate for such aircraft. If the Administrator finds that the aircraft conforms to the type certificate therefor, and, after inspection, that the aircraft is in condition for safe operation, he shall issue an airworthiness certificate. The Administrator may prescribe in such certificate the duration of such certificate, the type of service for which the aircraft may be used, and such other terms, conditions, and limitations, as are required in the interest of safety. Each such certificate shall be registered by the Administrator and shall set forth such information as the Administrator may deem advisable. The certificate number, or such other individual designation as may be required by the Administrator, shall be displayed upon each aircraft in accordance with regulations prescribed by the Administrator."

4. The Grant of Exemptions in pertinent part provides:
   "Aero Spacelines Inc. is hereby granted an exemption from the provisions of sections 1.68, 8.32 and 8.33 of Parts 1 and 8 of the Civil Air Regulations to the extent necessary to permit it to carry, on its Boeing 377PG airplane modified under the provisions of Part 8 for the special purpose of carrying spacecraft modules, persons and cargo for compensation or hire for the National

Aeronautics and Space Administration, subject to the following conditions:
   "(1) The cargo shall consist solely of S-IV Saturn and Apollo spacecraft modules and related cargo;
   "(2) The persons carried shall be restricted to the technicians designated by the National Aeronautics and Space Administration and carried to insure security and monitor loads to which cargo components are subjected in transit; and
   "(3) Cargo and persons may be carried only between locations as prescribed by the National Aeronautics and Space Administration.
   "This exemption shall remain in effect until December 31, 1968, unless sooner superseded or rescinded."

5. The Contract is stated to be one for "Air Transportation Services".
   ARTICLE I states appellee to be an independent contractor.
   ARTICLE II lists the equipment which appellee is required to furnish, as well as personnel, including a flight crew acceptable to NASA.
   ARTICLE III lists the equipment and personnel to be furnished by NASA, including "All necessary fuel and oil as required in the performance of this contract."
   ARTICLE IV deals with flight operations and provides:
   "A. During the period of performance, all movements of this aircraft shall have the advance approval of the contracting officer. The contractor shall furnish the aircraft, fully stablized, ready for loading, with full operation

On July 10, 1963, FAA issued a Certificate of Airworthiness covering the aircraft and restricted operating limitations for the aircraft. The aircraft was certificated "only for the special purpose of carrying spacecraft modules, persons and cargo for compensation or hire for the National Aeronautics and Space Administration." The operation of the aircraft for any purpose other than for which it was certificated was prohibited. The restrictions contained in the restricted oper-

crew within 48 hours after receipt of notice from the contracting officer.

"B. The contractor shall submit no later than midnight Thursday of each week a plan of operational movements for the next succeeding week until the aircraft has been formally certificated by the Federal Aviation Authority (FAA). As a minimum each plan shall state each trip contemplated; point of origin and point of termination of each trip; estimated number of miles of each trip; date of each trip. For the plan the week shall end at midnight Sunday. Contracting officer approval of the plan will be authority to make the planned movements. After FAA certification all movements of the aircraft shall be authorized by the contracting officer on a trip-by-trip basis."

ARTICLE V dealing with "PERFORMANCE REQUIREMENTS AND PAYMENT" provides, in subparagraph B:

"B. The contractor shall put forth his best effort to obtain formal FAA certification of this aircraft by June 27, 1963. A copy of the FAA certification will be furnished the contracting officer on or before June 27, 1963. In the event the contractor has not obtained the FAA certification of airworthiness for this aircraft by June 27, 1963, the period of performance of this contract shall automatically be extended by a number of days equal to the days of delay beyond June 27, 1963. In no event, however, shall the term of this contract extend beyond August 31, 1963."

ARTICLE IX dealing with "MAINTENANCE" provides:

"A. The contractor shall establish a maintenance capability and maintain the aircraft in an airworthy condition at all times during the period of performance of this contract. Maintaining the aircraft shall be construed to include the furnishing of all parts, equipment, materials, repairs, supplies and labor. All maintenance costs will be borne by the contractor.

"B. Necessary maintenance including preventive maintenance will be accomplished by properly FAA qualified maintenance personnel in strict accordance with the FAA air carrier's approved maintenance program.

"C. All required maintenance will be accomplished in a most expeditious manner in order to prevent any undue delay in operation of the aircraft. The contractor shall judiciously schedule maintenance to prevent conflict with government flight schedules.

"D. For all flights made for maintenance and/or training a reduction equal to $0.55 per mile flown shall be deducted from payments due the contractor."

ARTICLE X dealing with "SECURITY" provides:

"This scope of work is unclassified; however, the services to be provided will require the contractor's operating crew to have access to classified information. Therefore, all contractor employees to be assigned to the services of this contract shall be cleared through the 'secret' category of security clasification."

ARTICLE XI requires appellee to provide passenger insurance and public liability and property damage insurance.

ARTICLE XII dealing with "SAFETY STANDARDS" provides:

"The contractor shall be solely responsible for compliance with all safety standards and the level of maintenance and repair required to meet the safety standards prescribed by applicable FAA/CAB regulations; provided, however, that the contracting officer shall have the authority to direct additional measures if such is necessary in his opinion to assure safety of the aircraft passengers or cargo.

ARTICLE XIII dealing with "Conduct of Services" provides in subparagraph B. as follows:

"B. The contracting officer may, in addition to and not in limitation of any other rights under this contract, require the contractor to remove any employee that the government deems incompetent, careless, inefficient or otherwise objectionable, or whose employment is considered to be contrary to the best interests of the government."

ARTICLE XIV requires appellee to procure any necessary permits and licenses, and to obey all applicable laws and regulations of the United States and of the state wherein the services are performed.

ating limitations that formed a part of the certificate, stated:

"1. The *only* flights authorized are for the special purpose of carrying spacecraft modules, persons and cargo for compensation or hire for the National Aeronautics and Space Administration, subject to the following conditions (Ref. FAA Exemption # 258, dated May 2, 1963—Regulatory Docket No. 1679):

"a. The cargo shall consist solely of S–IV Saturn and Apollo spacecraft modules and related cargo;

"b. The persons carried shall be restricted to the technicians designated by the National Aeronautics and Space Administration and carried to insure security and monitor loads to which cargo components are subjected in transit; and

"c. Cargo and persons may be carried only between locations as prescribed by the National Aeronautics and Space Administration."

On September 6, 1963, NASA and appellee entered into a contract for "Air Transportation Services" for the term September 1, 1963, through June 30, 1964.

ARTICLE I of the contract provides:

"The contractor, as an independent contractor and not as an agent of the government, shall, on the terms and conditions hereinafter more particularly set forth, furnish to the government for its exclusive use and control one each B–377 PG Aircraft, Serial No. N1024V and furnish all personnel, facilities, equipment and materials, other than may be furnished by the government, necessary for the complete operation and maintenance of the aircraft in order to provide air transportation of S–IV stages, large booster components, tools, and fixtures, and such other cargoes as may be specified by the contracting officer."

ARTICLE II A. provides:

"A. EQUIPMENT: The contractor shall furnish, for the government's exclusive use and control, one (1) converted Boeing 377 Stratocruiser aircraft (commonly known as the 'pregnant guppy' with the capacities, capabilities, and/or appurtenances as follows: * * *."

ARTICLE IV A., under the heading "Flight Operations" provides:

"A. During the period of performance, all movements of this aircraft shall be at the direction of the contracting officer. The contractor shall furnish the aircraft, fully stabilized, ready for loading, with full operation crew within 48 hours after receipt of notice from the contracting officer."

Other relevant provisions of the contract appear in footnote [6] of this opinion.

The three violations alleged in the complaint occurred during the period of the contract of September 6, 1963, and on each of which occasions appellee operated the aircraft pursuant to its contract with NASA without obtaining a Commercial Operator's Certificate from the Administrator. Each flight involved the transportation of spacecraft components for use by NASA.

At the times of the above flights it was the position of the Federal Aviation Agency and its Administrator, which was communicated to appellee, that the oper-

---

**6.** ARTICLE II B. authorizes appellee to purchase all necessary fuel and oil required in the performance of the contract from the government at cost.

ARTICLE II C. provides that the flight crew furnished by appellee shall be acceptable to NASA.

ARTICLE V A. requires that the appellee shall furnish the aircraft and the other services set forth from September 1, 1963, through June 30, 1964.

ARTICLE V B. NASA agreed to utilize the aircraft for a minimum of 7,000 miles per month; and under

ARTICLE V C. NASA had the right to utilize the aircraft for additional miles not to exceed 16,000 per month, for a total of 23,000 per month.

The contract contained other provisions similar to those appearing in footnote 5, above.

ation of the aircraft required certification of appellee as a Commercial Operator under the appropriate regulations issued by the Federal Aviation Administrator. During the same time it was the position of appellee, which was communicated to the Federal Aviation Agency, that it was not required to secure a Commercial Operator Certificate because the aircraft was a "public aircraft" under the terms of the contract with NASA. The appellee did not withdraw its application to the Federal Aviation Agency for the issuance of a Commercial Operator Certificate, and the same was granted on November 13, 1963.

Since completion of the modification and successful flight of Boeing B–377 PG and up to the time the complaint was filed, no movement of said aircraft was made except at the direction and for the use of NASA, exclusive of crew training or check flights of which the FAA was advised.

This appeal involves the sole question of whether the aircraft here in question was a "public aircraft" as that term is defined in the Federal Aviation Act of 1958, as amended, [49 U.S.C. § 1301]. In pertinent part § 1301 provides:

"(14) 'Civil Aircraft' means any aircraft other than a public aircraft. * *.

"(30) 'Public Aircraft' means an aircraft used exclusively in the service of any government or of any political subdivision thereof, including the government of any State, Territory, or possession of the United States, or the District of Columbia, but not including any government-owned aircraft engaged in carrying persons or property for commercial purposes."

We note that in the stipulation of facts filed in the District Court, the parties stipulated that:

"The Federal Aviation Act of 1958 (49 U.S.C.A. § 1301 et seq.) restricts the applicability of Part 45 of the Civil Air Regulations to 'civil aircraft'."

Appellee acknowledges that if the aircraft is found not to be a "public aircraft", the three flights set forth in the complaint were made contrary to Part 45 of the Civil Air Regulations and that the appellee would be liable to a maximum civil penalty of $1,000 for each of the three flights.

Appellant concedes that if the aircraft in question was a "public aircraft" at the time of the three flights in question, within the meaning of that term as used in § 1301(30) supra, appellee was not required to obtain a Commercial Operator's Certificate under Part 45 of the Civil Air Regulations, and hence is not subject to the civil penalties prescribed by 49 U.S. C.A. § 1471(a) (1) supra.

In this respect appellant states:

"In enacting the Federal Aviation Act of 1958, Congress created the Federal Aviation Agency for the purpose of prescribing uniform rules and regulations for the use of navigable air space for all users—civil and military. It also authorized the Administrator of that agency to prescribe minimum rules and regulations and standards of safety for civil aircraft.

"The Act defines a third category of aircraft, i. e. 'public aircraft', but does not purport to give the Federal Aviation Agency, or any other agency, jurisdiction over such an aircraft or its operator."

No regulation has been issued by the FAA Administrator under the Federal Aviation Act of 1958, as amended, with respect to "public aircraft."

We note that the definitions of "civil aircraft", and "public aircraft" which appear in the Federal Aviation Act of 1958, as amended, are identical to the provisions contained in the Civil Aeronautics Act of 1938, and are substantially identical to the definitions of the same terms in the Air Commerce Act of 1926. No regulation was ever issued under any statutes with respect to "public aircraft." It would thus appear that aircraft used exclusively in the service of the government, but not including any government-owned aircraft engaged in carrying persons or property for commercial purposes, have long been exempt from regulatory control

and from rules and regulations relating to "civil aircraft."

The definition of "public aircraft" appearing in 49 U.S.C.A. § 1301(30) is simple, plain and unambiguous. It is an aircraft used exclusively in the service of any government, but not including any government-owned aircraft engaged in carrying persons or property for commercial purposes. Under the plain language, the aircraft used exclusively in the service of any government need not be a government-owned aircraft. To come within the definition of "public aircraft", the aircraft need only be used exclusively in the service of any government and need not be a government-owned aircraft engaged in carrying persons or property for commercial purposes.

From our review of the record in this case, much of which we have set forth in this opinion, we are forced to conclude, as did the District Court, that appellee's aircraft B–377 PG was used exclusively in the service of the government of the United States at the time the three flights in question were made; that such aircraft was a "public aircraft" within the meaning of the Federal Aviation Act of 1958, as amended; that appellee was not subject to the provisions of Civil Air Regulation 45.2, and therefore is not subject to the civil penalties set forth in 49 U.S.C.A. § 1471(a) (1).

Appellant argues that the aircraft in question was a "civil aircraft" because Congress must have intended that it be so classified, for otherwise appellee would not be subject to the regulations and standards prescribed by the FAA Administrator. We have reviewed the Congressional history relating to the enactment of the Federal Aviation Act of 1958, which has been called to our attention. We find nothing in such history which has bearing upon the intention of Congress in respect to the question presented by this appeal.

Appellant further argues that many of the provisions in the two contracts between appellee and NASA were unnecessary if the aircraft in question were a "public aircraft" and to conclude that the aircraft in question was a "public aircraft" would be to allow one government agency to contract away the powers and duties given by Congress to another agency. We do not find such arguments persuasive in light of the enactment by Congress of 49 U.S.C.A. § 1301(30), and the fact that the aircraft in question was used exclusively in the service of the United States.

The judgment of the District Court is affirmed.